LESTER JAMES RICHARD, JR. *vs.* COMMONWEALTH
(and two consolidated cases[1]).

Suffolk. Hampden. October 7, 1980. — January 14, 1981.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Duplicitous punishment, Sentence. *Homicide.*

There was no error in the imposition of consecutive sentences on defend-
ants who, after closing arguments at their trial, pleaded guilty to
armed robbery indictments and to so much of murder indictments as
charged murder in the second degree where during the course of the
trial each defendant testified to facts sufficient to warrant a conclusion
that the defendants, as joint venturers, knew there was a substantial
likelihood someone would be shot during the course of the robbery and
that they were willing participants in the acts which led to the victim's
death; the principles enunciated in *Commonwealth* v. *Stewart,* 375
Mass. 380 (1978), and *Commonwealth* v. *Wilson,* 381 Mass. 90
(1980), precluding consecutive sentences for murder and an under-
lying felony when the basis of the murder conviction has been, or may
have been, felony-murder, were not applicable in the circumstances.
[305-308]

INDICTMENTS found and returned in the Superior Court
on August 22, 1967.

The cases were reported to the Appeals Court by *Moriar-
ty,* J. The Supreme Judicial Court, on its own initiative,
ordered direct review.

PETITIONS filed in the Supreme Judicial Court for the
county of Suffolk on April 10, 1979, and February 24, 1980,
respectively.

The cases were reported by *Wilkins,* J., and *Liacos,* J.

*John Osler* for Lester James Richard, Jr.

*John F. Donahue* for James A. Gordon.

_____

[1] Commonwealth *vs.* James A. Gordon. Elton K. Parker *vs.* Common-
wealth.

*Claudia C. Conway* for Elton K. Parker.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.   On July 13, 1967, the Summit Package Store in Springfield was robbed and James A. Bryce, a clerk on duty, was shot to death.   Six men, including Lester James Richard, Jr., James A. Gordon, and Elton K. Parker (the petitioners), were indicted and jointly tried for murder in the first degree, armed robbery, and related offenses.   On March 19, 1968, after twelve days of trial and after all closing arguments had been presented, five of the defendants, including the three petitioners, pleaded guilty to certain of the indictments.   Each of the petitioners pleaded guilty to so much of the murder indictment as charged murder in the second degree; armed robbery; and conspiracy to commit armed robbery.   Each received a sentence of life imprisonment on the murder indictment and fifteen to thirty years on the armed robbery indictment, the latter to be served on and after the life sentence.[2]   The indictment charging conspiracy to commit armed robbery was ordered placed on file.[3]   After the guilty pleas were tendered, nolle prosequis were entered on the remaining related indictments, including that of conspiracy to commit murder.[4]

On April 10, 1979, the petitioner Richard brought a petition for a writ of error, challenging the legality of his consecutive sentence for the armed robbery.   A single justice of

[2] The remaining defendant, James E. Flowers, whose case went to the jury, was found guilty of murder in the first degree, armed robbery, conspiracy to murder and conspiracy to commit armed robbery.   The jury did not recommend clemency, and hence the judge sentenced Flowers to death on the murder conviction.   See G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12.   He imposed a concurrent life sentence on the armed robbery conviction, and ordered the two conspiracy charges placed on file.

[3] Parker also pleaded guilty to carrying a pistol without a permit, which indictment was ordered placed on file.

[4] Nol prossed were indictments charging each defendant with conspiracy to murder, being an accessory before and after the fact to murder, and conspiracy to being an accessory after the fact to murder.

this court reserved and reported the case to the full bench for decision on the petition. On July 17, 1979, the petitioner Gordon filed a motion to withdraw his guilty plea to the armed robbery, and on September 21 he filed a motion for a new trial. In these motions, he claimed his guilty plea was involuntary under *Boykin* v. *Alabama,* 395 U.S. 238 (1969),[5] and challenged the legality of his consecutive sentence for armed robbery. After a hearing, the judge found Gordon's plea had been knowing, intelligent and voluntary, and reported the question of consecutive sentences to the Appeals Court with the recommendation that it be transferred to the Supreme Judicial Court for consolidation with the case of *Richard* v. *Commonwealth.* The petitioner Parker brought a petition for writ of error similar to the one brought earlier by Richard, and on April 22, 1980, a single justice of this court reserved and reported the case to the full bench for decision on the question of the legality of the consecutive sentencing. All three cases were argued together.

The petitioners contend that the imposition of consecutive sentences for the armed robbery violates their right to be free from double jeopardy. They claim that their second degree murder convictions were based on a felony murder theory which, under our decisions in *Commonwealth* v. *Wilson,* 381 Mass. 90 (1980), and *Commonwealth* v. *Stewart,* 375 Mass. 380 (1978), precluded consecutive sentencing on the underlying felony of armed robbery. We disagree and affirm the consecutive sentences.

The facts, as summarized from the evidence presented before the jury, were as follows. On July 13, 1967, Richard, Parker, James E. Flowers, Albert Zachary and Harold Bass were together when Richard, according to his own testimony, indicated he was going to commit a robbery that night. Richard had rented a car. Before picking up

---

[5] In 1972 and 1973, Richard and Parker independently brought motions to vacate their guilty pleas and motions for new trials, all of which were denied. None of these motions questioned the legality of the consecutive sentences imposed for the armed robbery convictions.

Gordon, Richard, again according to his own testimony, said any one of the four men in the car could withdraw from the planned robbery if he wished.[6]

It was Richard's decision to go to Gordon's home to pick him up. He testified he knew Gordon had a gun because Gordon had shown it to him recently. When Gordon got into the car, Parker asked him if he had his "thing" with him, because they were going to "get [a] place." Gordon then went back into the house and returned with the loaded gun, which, he testified, he knew was to be used in the robbery.

After Gordon joined the group, Richard drove in the vicinity of a Cumberland Farms store they planned to rob. Both Gordon and Parker testified that at some point Gordon, sitting in the front seat, handed his gun to Parker, sitting in the back, and instructed him on how the gun operated. Parker and Zachary also testified that Gordon had let Flowers hold the gun but then took it away and gave it to Parker, saying Flowers was too high. There was testimony that Flowers had been given the gun after Richard inquired who was going to go into the store and Flowers responded, "Well, I'll do it . . . I wanted to kill a honkey, anyway." Richard said, "If he [the store attendant] even act . . . wrong, . . . he got to go, because there's too much time involved."

With Richard still driving, the group left the Cumberland Farms area after observing there were too many people around. They drove to, and considered robbing, two other stores[7] before they finally decided on the Summit Package

---

[6] According to Zachary, a codefendant who, along with Bass, testified on behalf of the Commonwealth, Richard said, "Anyone whose heart didn't pump blood could get out."

[7] According to Parker's testimony, Flowers and Parker had approached one of these two other stores when Parker noticed that there were some people outside the store entrance and that the storekeeper was about to close the store. Flowers told Parker to give him the gun. Parker refused, saying, "Look here, there's people out here." Flowers said, "I shoot them anyway." Parker did not give Flowers the gun and they walked away from the store.

store. Parker and Flowers got out to rob the store. The other four were to meet them on a nearby street.

Parker testified that he had the gun at this time, but that he became nervous about carrying it and gave it to Flowers just before they entered the package store. As Flowers denied ever entering the store, Parker's was the only testimony as to what happened inside. Parker testified that he asked the clerk, later identified as James A. Bryce, for some cold beer, Flowers then produced the gun, said, "This is a holdup," and told Bryce to open the cash register. Flowers reached into the cash register and took out all the money, leaving the bottom of the drawer bare. Bryce offered no resistance; he simply stood there frightened. Flowers asked Parker if anyone was coming. Parker looked around, replied no, and told Flowers he was leaving. Parker said he was just outside the store when a shot was fired; in this respect he was supported by the testimony of Gordon and Zachary, who had left the car after Flowers and Parker.

Gordon and Zachary then got back into the car and Richard drove away without Flowers and Parker. Ultimately all six met at Flowers' home. While there, Gordon was given a share of the proceeds for the use of his gun. On subsequent days various members of the group met again to coordinate alibis.

The dead body of James Bryce was found by a customer who, just before entering the store, had heard a shot and had seen two men running out of the store. When the police arrived, they also found blood in the bottom of the cash register where the money ordinarily would have been.[8] Medical evidence showed that Bryce had been killed by a gunshot, the bullet having entered at the outer edge of the left eye. Ballistic evidence matched the bullet recovered from Bryce's body with the weapon recovered from Gordon.

Richard, Gordon, and Parker each testified that Flowers at some point admitted he had shot the clerk. Flowers, in turn, testified that Parker had admitted the shooting to him.

---

[8] This fact was argued by the Commonwealth as proof that the murder took place after the robbery was completed.

In closing argument, the Commonwealth argued two theories of murder to the jury: premeditation and felony-murder. After closing arguments, but before the judge had given the jury instructions, all the defendants except Flowers withdrew their pleas of not guilty and entered counselled guilty pleas to various charges. For purposes of this case, the relevant guilty pleas entered by the petitioners were pleas to armed robbery and to so much of the murder indictments as charged murder in the second degree. At the sentencing hearing, the district attorney argued that this was a cold-blooded, vicious killing, and that the defendants were being given a break in being allowed to plead guilty to second degree murder. In recognition of the fact that parole eligibility under a second degree murder conviction arises in the fifteenth year of the mandatory life sentence, the district attorney recommended that there be a substantial on-and-after sentence for the armed robbery, of fifteen to thirty years. The judge imposed this recommended sentence. Nowhere in the record is there any indication whether the petitioners, by pleading guilty to second degree murder, were pleading guilty to felony-murder or to premeditated murder or other murder with malice aforethought. The absence of a specific label is not surprising, for at that time (1968) it made no difference what theory of murder formed the basis of their convictions. Years later, however, two decisions of this court have suggested that it may make a difference.

This court has decided two cases involving the question of consecutive sentencing for the underlying felony when the basis of the murder conviction has been, or may have been, felony-murder. In *Commonwealth* v. *Stewart*, 375 Mass. 380 (1978), we held that when "the Commonwealth has elected to proceed *solely* on the ground that the murder was committed in the commission or attempted commission of a crime punishable by life imprisonment, consecutive sentences for the homicide and the underlying felony are inappropriate and excessive" (emphasis added). *Id.* at 390. In *Stewart*, the trial judge instructed the jury solely on a theory

of felony-murder. *Id.* at 391-393. Because the jury's verdict of guilty on the charge of armed assault in a dwelling did not require proof of any facts different from those necessary to prove the charge of felony-murder, we concluded that under the "same evidence" rule of *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871), the consecutive sentence imposed for the armed assault charge could not stand. *Id.* at 391-393 (vacating that sentence and ordering a new sentencing hearing).

In *Commonwealth* v. *Wilson,* 381 Mass. 90, 124 (1980), we refused to limit Stewart to cases in which the jury verdict necesssarily rested solely on a felony-murder theory, holding instead that "whenever the *possibility* exists that a jury might have reached a verdict of murder in the first degree on the basis of a felony-murder theory, a consecutive sentence may not be imposed for the underlying felony" (emphasis added). *Id.* In *Wilson,* the trial judge instructed the jury not only on a felony-murder theory, but also on a theory of premeditated murder. *Id.* Because it was unclear on which theory the jury based its verdict of guilty on the murder charge,[9] the sentence imposed on the underlying felony of armed assault in a dwelling was vacated. *Id.* at 92.

The petitioners argue that because it is unclear which theory of murder formed the basis for their convictions, their consecutive sentences must be vacated under the principles of *Stewart* and *Wilson.* We do not agree. We are dealing here, not with jury verdicts of murder, but with guilty pleas to second degree murder. Nothing that we have said in *Stewart* or *Wilson* makes the principles of those cases applicable to such guilty pleas.

---

[9] Despite this uncertainty, we considered "significant" the fact that the prosecutor recommended a concurrent sentence on the armed assault charge, thus "impliedly recognizing that felony-murder . . . was the theory of the Commonwealth's case." *Commonwealth* v. *Wilson,* 381 Mass. 90, 125 n.63 (1980). In contrast, the prosecutor in the case before us strenuously argued for the consecutive sentences that were ultimately imposed.

Unlike a conviction of first degree murder, neither an underlying felony nor any intentional killing is required for a conviction of second degree murder. All that must be proven is malice aforethought, which includes "any unexcused intent . . . to do an act creating a plain and strong likelihood that death or grievous harm will follow." *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980). Similarly, in order to be guilty of murder, a joint venturer must "intend that the victim be killed or know that there is a substantial likelihood of the victim's being killed." *Commonwealth* v. *Podlaski*, 377 Mass. 339, 347 (1979).

We believe the evidence amply warranted such findings as to the petitioners, on a joint venture basis.[10] Accepting, as does the Commonwealth, that Flowers actually killed Bryce, the evidence shows that each petitioner knew that there was a "substantial likelihood" of a storekeeper's being shot. According to the testimony at trial, Flowers earlier had told the petitioners he wanted to kill a "honkey." Richard fairly may be characterized as the mastermind of the scheme; he initially suggested the robbery, sought out Gordon, who had a gun, and advised that the gun be used should the victim "even act wrong." Gordon brought a loaded gun into the venture and gave instructions on its use. Finally, Parker held the gun before entering the package store and then handed it to Flowers, who had told him shortly before that he (Flowers) would shoot by-standers.

---

[10] The petitioner Parker contends that to construe his guilty plea as an admission of intentional murder would violate the constitutional procedures of *Henderson* v. *Morgan*, 426 U.S. 637 (1976). Even if *Henderson* were held to apply retroactively to the 1968 guilty pleas in this case — an issue we do not here decide, see *Commonwealth* v. *Swift, ante* 78, 82 n.3 (1980) — the requirements of *Henderson* would be met. That case merely requires that a defendant either admit to facts which make out the essential elements of the crime to which he is pleading guilty, or be given an explanation of those elements. *Id.* at 646. During the course of their twelve-day trial, each petitioner testified to facts sufficient to establish the requisite malice aforethought for second degree murder, the crime to which he pleaded guilty. Cf. *Commonwealth* v. *Huot, supra* at 408-410, and cases cited.

An accomplice's mental state may be inferred "from the course of conduct engaged in with the principal. This is not a case of an individual accidently or unknowingly involved in a criminal enterprise of unanticipated scope." *Commonwealth* v. *Scanlon*, 373 Mass. 11, 18 (1977). Here, as in *Scanlon*, the evidence warrants the conclusion that the petitioners "knew of the 'substantial likelihood' that death would follow from the actions of [the person who pulled the trigger] and that [they were] willing participant[s] in the acts which led to that death." *Id.* at 19.

As consecutive sentences were permissible here based upon the guilty pleas to second degree murder and armed robbery, we uphold the sentences imposed in these cases.[11] We add that a persuasive argument could be made that, if the petitioners were entitled to relief here, that relief would not take the form, as urged by them, of vacating the "from and after" armed robbery sentences. Rather, it can be argued that the appropriate result would be to vacate all guilty pleas and restore the first degree murder and armed robbery indictments for trial or other disposition. This result would follow from reasoning that the petitioners, who now challenge their plea bargain, are not free to seek to enforce part of that bargain and reject the remainder.

The judgments in the cases against Richard and Parker are affirmed. The issue reported by the Superior Court judge in the case of Gordon is answered as stated in the preceding paragraph, and that case is remanded for proceedings consistent with this opinion.

*So ordered.*

---

[11] Nevertheless, it is of course advisable in future cases in which such a combination of guilty pleas is offered, and consecutive sentences are contemplated, that full inquiry be addressed to the defendant to assure that he is informed upon the issues raised in *Stewart* and *Wilson*.